IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MICHAEL T. BLAGMON,         )
        Plaintiff,       )
                        )
     v.                  )        Civil Action No. 3:24CV108 (RCY)
                        )
HANOVER COUNTY,          )
        Defendant.     )
_____)

**MEMORANDUM OPINION**

This is a race discrimination action brought by Plaintiff Michael T. Blagmon against his employer, Defendant Hanover County. Plaintiff, a Firefighter/Medic for Defendant, alleges that Defendant discriminated against him by repeatedly removing him from an acting officer position in order to avoid paying him acting officer pay while concurrently allowing four Caucasian employees to earn acting officer pay. The matter is presently before the Court on Defendant's Motion for Summary Judgment, ECF No. 30. The matter has been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons stated below, the Court will grant-in-part and deny-in-part Defendant's Motion for Summary Judgment.

## I. BACKGROUND

In reviewing a motion for summary judgment, the Court exercises great care to resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). Under the Local Rules, the Court may accept those facts identified by the movant as undisputed to be admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion and supported by reference to record evidence. E.D. Va. Loc.

Civ. R. 56(B).  After review of the parties' briefs and exhibits provided in support thereof, *see generally* Mot. Summ. J., ECF No. 30; Br. Supp., ECF No. 31; Resp. Opp'n, ECF No. 35; Reply, ECF No. 36, the Court has concluded that the following narrative represents the undisputed facts for the purpose of resolving the Motion for Summary Judgment:

## A. General Background

Hanover County ("Defendant" or "the County") conducts its fire and emergency response efforts out of fourteen "career stations."  Def.'s Stmt. Undis. Facts ("SUF") ¶ 3, ECF No. 31. These stations are organized into two battalions:  Battalion 1, covering the eastern portion of the County, and Battalion 2, covering the western portion of the County.  *Id.* ¶ 4.  Each battalion is overseen by a Battalion Chief.  *Id.*  Each station operates on three shifts—A, B, and C—staffed by Firefighter/Medics, with one Lieutenant[1] assigned per shift to oversee station operations.  *Id.* ¶ 3. Lieutenants report to their respective Battalion Chiefs, who in turn report to the Assistant Chief of Operations.  *Id.* ¶¶ 3, 6.  The Assistant Chief of Operations, Assistant Chief of Administration, and Assistant Chief of Community Risk Reduction and Planning report to the Fire Chief.  *Id.* ¶ 7.

Michael T. Blagmon ("Plaintiff" or "Blagmon") is an African American man who has worked for Hanover County since 2009 as a Firefighter/Medic; he has been assigned to C shift at Station 4 since 2012.  SUF ¶¶ 1–2; Resp. Opp'n Mot. Summ. J. ("Resp. Opp'n") Ex. 5 ¶ 1, ECF No. 35-5 [hereinafter, "Blagmon Aff."].  Station 4 is a part of Battalion 2.  SUF ¶ 4.

Relevant to the timeframe of Plaintiff's claims, Plaintiff served on Station 4's Shift C (commonly referred to as "4C") under Lieutenant ("Lt.") Stacy Reeves until July 31, 2020, and under Lt. John Clements from September 1, 2020, to August 2023.  *Id.* ¶¶ 20–21, 40–41.  Plaintiff's

---

[1] A Lieutenant is a "higher-level supervisory position" than a Firefighter/Medic.  SUF ¶ 18.  A candidate must meet a number of requirements before he/she is able to get promoted; these include completing all "required certifications, taking a written test, completing a special project, and participating in an interview."  *Id.*

Battalion Chief during this time was Lee Mooney, who served in this position from 2020 to May 15, 2023. *Id.* ¶ 5. Robert Phipps served as the Assistant Chief of Operations from 2007 to March 2022, and Eddie Buchanan served as the Assistant Chief of Administration from July 2002 to May 2022. *Id.* ¶¶ 6–7. Jethro Piland, III served as the Country's Fire Chief from 2013 to December 1, 2023. *Id.* ¶ 8.

Station 4 required a minimum of five personnel on-duty per shift: three employees to staff the fire engine and two to staff the ambulance. *Id.* ¶ 10. The fire engine has three specific assignments: the Officer in Charge, the Driver, and the Backwards Firefighter (noted on the "Ride Board," the County's scheduling program, as "OIC," "DRV," and "FF1," respectively). *Id.* ¶ 11–12. When assigned to the ambulance, the employees are designated as "AMB" on the Ride Board. *Id.* ¶ 13. The OIC, who rides in the front right seat of the fire engine, is a tactical position "that makes emergency response decisions to manage the crew and carries out the daily duties of the stations." *Id.* ¶ 11. In the event a station exceeded their minimum staffing requirement, excess firefighters would be transferred to other stations to fill any vacancies. *Id.* ¶ 14. In the event excess personnel were not available to fill a vacancy, personnel could volunteer for overtime or be brought in for mandatory overtime. *See id.* ¶ 9. These types of personnel changes are documented in Ride Board, and overtime personnel are highlighted in blue. *Id.* ¶ 9.

The Hanover County Fire Department ("Department") has an Acting Officer Program, "[t]he overall goal of [which] is to teach the candidate how to perform as a company officer before they operate as an Incident Commander in a dynamic system." Br. Supp. Ex. 7 at 2, ECF No. 31-7 (Acting Officer Program application and program description). The County also has a policy, "Pay for Serving in Acting Capacity," that allows as follows:

> Whenever an exempt or non-exempt employee is required to work in the capacity of a higher-level supervisory position for a period exceeding one (1) full pay period,

3

such employee may be paid additionally for assuming the higher-level duties. Such assumption of duties must be approved by the appointing authority and County Administrator. A salary supplement in an amount to be determined by the County Administrator, not exceeding 10% of the regular rate of pay, may be granted to the employee, in consideration of any additional duties or responsibilities. During the acting period, the employee is ineligible to receive additional pay for the first full pay period. Eligibility for acting pay shall start at the beginning of the second pay period. This policy does not apply to situations where the temporary absence/vacancy is caused by the use of PTO and/or compensatory leave—unless such leave is related to a serious health condition of the employee and/or Family and Medical Leave or Military Leave. Requests for "acting pay" shall be made in writing and in advance by the department head to the Director of Human Resources who shall provide the review and necessary processing. Retroactive requests will not be considered. Exceptions to this policy may be made by the County Administrator.

SUF ¶ 16; *see also* Br. Supp. Ex. 8, ECF No. 31-8 [hereinafter Policy 6.6]. An employee may receive "acting pay" after his chain of command submits a request. SUF ¶¶ 16–17. Either an employee's Lieutenant or Battalion Chief will submit a request to the Assistant Chief of Operations before the request is submitted to the Assistant Chief of Administration. *Id.* ¶ 17. The request is then submitted to the Fire Chief for approval before going to Human Resources for final approval and processing. *Id.* Plaintiff obtained his acting officer certificate in 2018 and was thereafter able to serve as an acting officer and eligible for acting pay. *Id.* ¶¶ 15–16.

**B.  Events Prior to June 11, 2021**

Lt. Reeves departed Station 4C on July 31, 2020, creating a supervisory vacancy that lasted until September 1, 2020, when Lt. Clements assumed his role as the Station 4C Lieutenant. *Id.* ¶¶ 20–21. During that vacancy period, Plaintiff served as the OIC for five shifts across two pay periods. *Id.* ¶ 22. Lt. Clements was subsequently out on sick leave from October 20, 2020, to November 10, 2020. *Id.* ¶ 24. On November 15, 2020, after his return, Lt. Clements submitted a request to Battalion Chief Mooney for retroactive acting pay for Plaintiff. SUF ¶ 25; *see also* Br. Supp. Ex. 11, ECF No. 31-11. The request was denied, and Battalion Chief Mooney informed Lt.

4

Clements he "ha[s] not asked anything of [Plaintiff] above and beyond the level of an acting officer.  Time alone is not sufficient or consistent with the way we have done things in the past." Br. Supp. Ex. 11, ECF No. 31-11.  Around that time, a Caucasian Firefighter/Medic, Dallas Larsen, served as the acting officer at Station 17A and received acting pay from October 1, 2020, to March 15, 2021.  SUF ¶ 48.

## C.  June 11, 2021, to Present

On August 20, 2021, Lt. Clements was placed on restricted duty for a shoulder injury, *id.* ¶ 30, as a result of which he was temporarily reassigned away from Station 4C.  *See id.* ¶ 30, 34, 35, 40, 41; Clements Dep. 22:2–8, ECF No. 31-3.  During Lt. Clements's absence from Station 4C, Plaintiff served as the OIC for nineteen out of the thirty-two shifts that he worked.  Br. Supp. Ex. 2 at 7–138, ECF No. 31-2 (daily schedules for C shift from August 20, 2021, through November 29, 2021); *see* SUF ¶ 31 ("Blagmon was assigned to serve as OIC at station 4C unless there was an officer—lieutenant or captain—assigned to the shift," other than three exceptions). On twelve of the thirteen instances where Plaintiff was not assigned to the OIC position, an overtime Lieutenant served as the OIC.  Br. Supp. Ex. 2 at 7–138, ECF No. 31-2.  On December 1, 2021, Captain Brian Lanham was reassigned to serve as the supervisor of Station 4C.  SUF ¶ 33. Around that same time, there were three Caucasian Firefighter/Medic employees who received acting pay for supervisory stand-in work they performed.  *Id.* ¶¶ 49–51.  Thomas Whitaker worked at Station 11B and received acting pay from May 16, 2021, to June 30, 2021.  *Id.* ¶ 49.  Christopher Fessler worked at Station 3C and received acting pay from July 16, 2021, to October 15, 2021, and Kevin Mills worked at Station 9A and received acting pay from August 1, 2021, to November 30, 2021.  *Id.* ¶¶ 50–51.

5

On March 16, 2022, a Battalion Chief informed Assistant Chief Buchanan that Lt. Clements had concerns about Plaintiff not receiving acting pay pursuant to Policy 6.6. *Id.* ¶ 35. As a result, Assistant Chief Buchanan spoke with Lt. Clements before meeting with Human Resources Director Janet Lawson on March 17, 2022. *Id.* ¶ 36. Lastly, Assistant Chief Buchanan spoke with Plaintiff on March 18, 2022, at which time he explained to Plaintiff that it had been the Department's practice to rotate firefighters out of the OIC position to avoid Policy 6.6. *Id.* ¶¶ 36–37.

On April 7, 2022, Plaintiff filed his EEOC charge. *Id.* ¶ 52; *see also* Br. Supp. Ex. 22, ECF No. 31-22. Around that same time, the Department decided that they would identify acting supervisors pursuant to Policy 6.6 rather than rotating OICs out of their positions during a Lieutenant vacancy. SUF ¶ 39. Thereafter, Plaintiff served as the acting supervisor and received acting pay on three separate occasions: June 1, 2022, to July 18, 2022; December 1, 2022, to January 16, 2023, and June 16, 2023, to July 16, 2023. *Id.* ¶¶ 40–43.

## II. PROCEDURAL HISTORY

Plaintiff filed his EEOC charge on April 7, 2022, to which Defendant responded on November, 2022. Br. Supp. Ex. 22, ECF No. 31-22 [hereinafter EEOC Charge]; Resp. Opp'n Ex. 4, ECF No. 35-4 (Defendant's EEOC Response); Resp. Opp'n 3–4, ECF No. 35. Plaintiff received his right to sue letter on January 16, 2024, and filed his Complaint in this Court shortly thereafter, on February 15, 2024. Compl. 1, ECF No. 1.

On January 24, 2024, Defendant filed this instant Motion for Summary Judgment and Brief in Support thereof. Mot. Summ. J., ECF No. 30; Br. Supp., ECF No. 31. Plaintiff responded on February 7, 2025, Resp. Opp'n, ECF No. 35, and Defendant replied on February 13, 2025, Reply, ECF No. 36. The matter is accordingly ripe for review.

### III.  STANDARD OF REVIEW

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48.  A material fact is one that might affect the outcome of a party's case.  *Id*. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor.  *Anderson*, 477 U.S. at 247–48; *JKC Holding Co.*, 264 F.3d at 465.

Furthermore, to defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact.  *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252.  Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995).  "Thus, if the evidence

7

is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Id.* (quotation marks and citation omitted).

## IV. DISCUSSION

Plaintiff's Complaint alleges race discrimination in violation of Title VII (Count I) and race discrimination in violation of 42 U.S.C. § 1981 (Count II). Defendant asserts two main arguments for why this Court should grant summary judgment in its favor on Plaintiff's Title VII claim: first, that Plaintiff was not treated differently than similarly situated employees outside his protected class, Br. Supp. 15–18, and second, that Plaintiff fails to rebut Defendant's legitimate non-discriminatory reason for its actions towards Plaintiff, *id.* at 18–21. With respect to Plaintiff's § 1981 claim, Defendant argues that Plaintiff cannot satisfy the heightened but-for causation standard imposed by § 1981 and further that Plaintiff cannot establish that his rights were violated because of a policy or custom of the County. *Id.* at 22–25. For the reasons that follow, the Court finds that Plaintiff's Title VII claim (Count I) survives summary judgment, but summary judgment is appropriate on the § 1981 claim (Count II).

### A. Title VII Racial Discrimination

In Count One, Plaintiff presents a claim for race-based discrimination in violation of Title VII. *See* 42 U.S.C. § 2000e–2(a). The Court first defines the permissible scope of Plaintiff's Title VII claim, before turning to the question of whether the claim survives Defendant's Motion for Summary Judgment.

#### 1. Scope of Plaintiff's Title VII Claim

Before filing a suit under Title VII, a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC. *Walton v. Harker*, 33 F.4th 165, 172 (4th Cir. 2022); 42 U.S.C. § 2000e-5(b). This requirement imposes two limitations on any subsequently filed civil suit. First,

such subsequent suit is limited in substantive scope, insofar as "[o]nly those discrimination claims stated in the initial [EEOC] charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent . . . lawsuit." *Walton*, 33 F.4th at 172 (quoting *Stewart v. Iancu*, 912 F.3d 693, 705 (4th Cir. 2019)). Second, even in-scope claims must have been brought in the original EEOC charge within the applicable statute of limitations. *See* 42 U.S.C. § 2000e-5(e)(1)). Because Virginia is a "deferral" state, that period is 300 days. *See Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 517 (4th Cir. 2000) (identifying Virginia as a "deferral state"); *Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 811 (E.D. Va. 2003) ("In a 'deferral' state, like Virginia, this [EEOC] charge must be filed no later than 300 days 'after the unlawful practice occurred.'").[2]

Based on the statute of limitations, the Court will only consider the evidence arising between June 11, 2021,[3] and the present when evaluating the foundation of Plaintiff's Title VII claim. In other words, the question before the Court is whether the evidence is sufficient to support a finding that Defendant unlawfully discriminated against Plaintiff when it periodically rotated Plaintiff out of the OIC role at Station 4C to prevent him from accruing acting pay during Lt. Clements's "light duty" period (approximately August 20, 2021, through December 1, 2021). The Court may, as needed, consider allegations outside the statute of limitations as relevant background evidence for otherwise timely claims. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). However,

---

[2] Certain exceptions do exist with respect to this statute of limitations, e.g., in the limited circumstances provided by equitable tolling or the continuing violation doctrine. *See Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) (discussing equitable tolling); *Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) (discussing the continuing violation doctrine). Neither doctrine is applicable here.

[3] June 11, 2021, is 300 days prior to Plaintiff filing his EEOC charge. Br. Supp. Ex 22, ECF No. 31-22.

actions taken outside of the statute of limitations may not constitute the basis of Plaintiff's Title VII claim.

### 2. Plaintiff's Title VII Claim Survives Summary Judgment

Title VII prohibits unlawful discrimination in the employment context, which includes discrimination based on race. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025); *see* 42 U.S.C. § 2000e–2(a). A plaintiff may prove race discrimination under Title VII through either "(1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973), and its progeny." *Wannamaker-Amos*, 126 F.4th at 255 (citing *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019)). "It is left to the plaintiff's discretion whether to proceed by direct and indirect[, i.e., circumstantial,] evidence or by means of the *McDonnell Douglas* burden-shifting framework." *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Here, Plaintiff proceeds solely under the *McDonnell Douglas* framework, *see* Resp. Opp'n 13–21, so the Court will not address Defendant's arguments for summary judgment predicated on Plaintiff's failure to demonstrate direct evidence of race discrimination, *see* Br. Supp. 13–15.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Wannamaker-Amos*, 126 F.4th at 255. "In pay-disparity cases, the *prima facie* case requires a plaintiff to establish that '(1) []he is a member of a protected class, (2) []he was performing [his] job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive.'" *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 572 (4th Cir. 2023) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019)). "Typically, . . . the circumstance that 'suggest[s] an unlawfully discriminatory motive' is the existence of a . . . comparator." *Id.* (quoting *Spencer*, 919

F.3d at 207).  In the summary judgment context, a plaintiff is required to "point to 'evidence on which a jury could reasonably find for' [him]," on each of these *prima facie* elements.  *Id.*  The burden of production then shifts to the defendant to present evidence "to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action."  *Wannamaker-Amos*, 126 F.4th at 255.  Assuming that the defendant can meet its burden, the plaintiff must then "prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'"  *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Notwithstanding the intricacies of the *McDonnell Douglas* framework, "the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'"  *Id.* (quoting *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010)).  "Courts must therefore 'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination' of the ultimate question of discrimination."  *Id.* (alteration in original). For the reasons articulated below, the Court finds that Plaintiff has presented sufficient evidence to make a *Prima Facie* case of race discrimination under Title VII and for a jury to find by a preponderance of the evidence that Defendant's stated reasons for the apparent disparity are pretextual.

     *a.  Plaintiff Makes a* Prima Facie *Case*

The parties do not dispute that Plaintiff is a member of a protected class or that he performed his job satisfactorily.  *See* Piland Dep. 51:3–12, ECF No. 31-6;[4] Mooney Dep. 69:12–

---

[4] Plaintiff and Defendant each submitted their own (sometimes overlapping) excerpted portions of various depositions in support of their summary judgment briefs.  To avoid confusion regarding which excerpt-source the Court is referencing, the Court will include the applicable ECF number each time any deposition is cited.

21, ECF No. 35-10; *see generally* Br. Supp.  Defendant further appears to concede that Plaintiff has sufficient evidence to demonstrate that he suffered an adverse employment action by not receiving acting pay, insofar as Defendant does not challenge this third *McDonnell Douglas* factor in its brief in support of summary judgment.  Instead, Defendant primarily argues that Plaintiff has not established the fourth *McDonnell Douglas* element, insofar as he has not produced evidence upon which a jury could reasonably find that he was similarly situated to his Caucasian counterparts who were not likewise "prevented" from receiving acting pay.  Thus, Defendant argues, the evidence and circumstances do not suggest that Defendant acted based on an unlawful discriminatory motive.  The Court disagrees.

Whether a plaintiff is similarly situated to a comparator is typically "a fact question," so long as a court finds, as a matter of law, that there is a sufficient "basis for comparison to submit to the fact finder."  *Tinsley v. City of Charlotte*, 854 F. App'x 495, 501 (4th Cir. 2021).  A comparison between employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances."  *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381–83 (4th Cir. 2022) (quoting *Cook v. CSX Transp. Corp.*, 988 F. 2d 507, 511 (4th Cir. 1993)).  There is "no bright-line rule for what makes two jobs 'similar' under Title VII," *id.* (quoting *Spencer*, 919 F.3d at 207); however, courts generally consider "whether a plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and[,] . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Id.* (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)); *Spencer*, 919 F.3d at 207 (instructing that courts should consider the above-listed factors, as well as whether the employees

"had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision").

Here, Plaintiff identifies four Caucasian employees as comparators:  Dallas Larsen, Thomas Whitaker, Christopher Fessler, and Kevin Mills.  Br. Supp. 16.  These men were all employed by Hanover County as Firefighter/Medics and received acting pay for serving as the acting officer of their respective stations at different times from October 1, 2020, to November 30, 2021.  *See* Br. Supp. Ex. 17, ECF No. 31-17 [hereinafter Larsen Acting Pay Req.]; Br. Supp. Ex. 18, ECF No. 31-18 [hereinafter Whitaker Acting Pay Req.]; Br. Supp. Ex. 20, ECF No. 31-20 [hereinafter Fessler Acting Pay Req.]; Br. Supp. Ex. 21, ECF No. 31-21 [hereinafter Mills Acting Pay Req.].  During that same timeframe, Plaintiff was similarly employed as a Firefighter/Medic. SUF ¶ 1.  Plaintiff and comparators had all completed the Department's Acting Officer Program prior to October 2020.  *Id.* ¶¶ 15, 48–51.

Defendant argues that Plaintiff and these purported comparators were not similarly situated because they did not have the same supervisor, the comparators were either qualified to apply for or had qualified for promotion to Lieutenant, and the comparators each filled a higher-level capacity (i.e., that of a Lieutenant) than did Plaintiff when he merely stepped in to work OIC shifts. Br. Supp. 16–17.  The Court addresses these arguments in turn.

### i.  *Whether Plaintiff and his comparators shared the same supervisor is not dispositive.*

Defendant bases its uncommon-supervisor argument on the fact that "a request to serve as an acting supervisor or receive acting pay must move up through the chain of command," making the question of shared supervisor(s) particularly relevant to the question of comparison.  Br. Supp. 16–17.  The Court first notes that having the same supervisor is not alone dispositive of whether Plaintiff was similarly situated to his comparators.  *See Cowgill*, 41 F.4th at 382 (whether a plaintiff

and his comparators shared the same supervisor is not outcome determinative, so long as the "comparators are otherwise similar in 'all relevant respects.'" (quoting *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005))). However, Defendant is correct that the supervisor's role in acting pay decision making does give this factor more weight than it might carry in other circumstances. Because the specific basis for Plaintiff's Title VII claim is that he was periodically rotated out of the OIC role to prevent his eligibility for acting pay, and thus he was deprived of such pay when other (Caucasian) Firefighter/Medics were not similarly rotated, *see supra* Part IV.A.1, the relevant supervisory question is, who made the decision to rotate Plaintiff out of the OIC role? Or, put differently, who made the decision to task lieutenants with overtime shifts to fill staffing requirements at Station 4C, such that Plaintiff would inevitably be removed from the OIC role pursuant to the Department's policy that if an officer was on shift, that officer served as OIC? The evidence before the Court makes clear that the decision lay with Battalion Chief Mooney. *See* Mooney Dep. 11:6–11, 23:14–24:3, 26:7–30:7, 35:10–37:22, 38:15–25, 50:3–25, ECF No. 35-10 (acknowledging that he would sometimes assign staff positions—including the OIC role—in the Ride Board; that he was responsible for the decision to transfer Blagmon to Truck 13 for training; that he rotated Blagmon in and out of the OIC position; and that the records reflected he assigned Blagmon to a driver position and another employee to OIC; Clements Dep. 41:5–42:16, ECF No. 35-7 ("[I]t's up to the battalion chiefs to assign people to stations unless it's trade time."); Buchanan Dep. 44:23–45:1, ECF No. 35-6 (confirming that it was Battalion Chief Mooney who made the decision to substitute people in and out of the different positions).

Because Larsen, Whitaker, Fessler, and Mills did not report to Battalion Chief Mooney, *see* SUF ¶¶ 48–51, they did not share a common supervisor with Plaintiff in the relevant regard, i.e., the individual making the critical decision of whether they should be rotated out of the OIC

14

role. Notwithstanding this fact, the distinction is not dispositive, because—for the reasons articulated below—Plaintiff has presented sufficient evidence for a jury to find that the "comparators are otherwise similar in 'all relevant respects.'" *Cowgill*, 41 F.4th at 382 (quoting *McMillan*, 405 F.3d at 414).

> ii. *The record evidence does not show that Plaintiff's and the comparators' promotion-eligibility was considered when Defendant made acting-pay decisions.*

With respect to Defendant's argument that Plaintiff and comparators were not similarly situated due to their different promotable status, or eligibility to apply for promotion, the proper consideration is whether "the employer considered th[is] . . . factor[] in making the personnel decision." *Spencer*, 919 F.3d at 207. Despite Defendant's references to Chief Piland's general opinion that, "if you are serving at a higher level, a higher level of leadership, you should meet the qualifications of that job description," Br. Supp. 17–18, the record does not support a finding that being qualified to apply for or being qualified for promotion to Lieutenant was a requirement for receiving acting pay, or even that it was an informal consideration. *See* Buchanan Dep. 26:17–28:3, ECF No. 35-6; Mooney Dep. 31:11–22, ECF No. 35-10; Policy 6.6. Accordingly, though this may indeed be a fact that sets Plaintiff and the proposed comparators apart, it does not appear—based on the evidence presented—to be one that Defendant actually considered in making the challenged decision to periodically rotate Plaintiff out of the OIC role in order to prevent Plaintiff from obtaining acting pay eligibility. *Spencer*, 919 F.3d at 207. As such, it is not proper ground for finding that the comparators are dissimilar to Plaintiff.

### *iii.  Plaintiff and the comparators engaged in the same material conduct.*

Finally, Defendant argues that Plaintiff and his proposed comparators are dissimilar because Larsen,[5] Whitaker, Fessler, and Mills "serve[d] in a higher level capacity—i.e., as a lieutenant—during lieutenant vacancies," whereas Plaintiff only served as OIC at Station 4C.  Br. Supp. 17.  The Court construes this as an argument that, based on the nature of the work for which acting pay was or would otherwise have been sought, Plaintiff and his proposed comparators did not "engage[] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Cowgill*, 41 F.4th 381 (quoting *Haywood*, 387 F. App'x at 359).  In support, Defendant points to Chief Piland's deposition, in which Chief Piland describes how the OIC role is not a "higher-level supervisory position" than that of a standard Firefighter/Medic, because it does not carry with it the "administrative duties of discipline and review" of the actual "next level of leadership."  Br. Supp. 17–18 (quoting Piland Dep. 61:10–25, ECF No. 31-6).  Defendant also argues that the evidence shows that Larsen, Fessler, Whitaker, and Mills were tasked with serving as "acting lieutenant[s] during lieutenant vacancies," Reply 11–12 (citing Larsen Acting Pay Req.; Whitaker Acting Pay Req.; Fessler Acting Pay Req.; Mills Acting Pay Req.), whereas Plaintiff merely filled in for OIC shifts during his supervisor's FMLA leave and while his supervisor was on restricted duty.

In response, Plaintiff argues that "the comparators were asked to serve . . . for the vacancies as lieutenants, and [that] is the same requirement of the Plaintiff and [what] he did."  Resp. Opp'n 20.  Plaintiff supports this position with a November 15, 2020 email from Lt. Clements that characterized Plaintiff as having "fill[ed] in during [Clements's] absence and during the previous

---

[5] The Court includes Larsen in its comparator analysis despite the fact that Larsen received acting pay prior to June 11, 2021, i.e., beyond the limitations period for Plaintiff's Title VII claim, because such evidence does not constitute the basis for Plaintiff's claim and instead simply serves as relevant background evidence.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

vacancy." *Id.* at 21 (citing Br. Supp. Ex. 11).  Plaintiff also points to his Affidavit and Defendant's Exhibit 2, which purportedly show that during the periods where he was rotated out of the OIC role, an overtime lieutenant filled the role in his stead twelve out of thirteen times.  Resp. Opp'n 21 (citing generally Blagmon Aff.; Br. Supp. Ex. 2); *see* Blagmon Aff. ¶ 9(3) (noting that Defendant's Exhibit 2 demonstrates that "During Clements['s] Restricted Duty/FMLA [leave] (September 21–December 2, 2021) Lieutenants were hired on OVERTIME to purposefully break my cycle and remove me from the OIC spot.").  The inference to be drawn from this evidence is, presumably, that because a lieutenant otherwise filled the role occupied by Plaintiff, Plaintiff was performing lieutenant-level duties.  Beyond this particularized rebuttal, Plaintiff simply attaches sixteen other exhibits to his Response in Opposition, consisting of deposition testimony, emails, and other documentary evidence.

Defendant primarily[6] replies by reiterating that Plaintiff was *not* in fact asked to serve as an acting lieutenant during Lt. Clements' injury leave in the Fall of 2021; rather, he merely filled in for OIC shifts during that time.  *See* Reply 11–12 (citing Piland Dep. 56:21–24, 61:10–25, ECF No. 31-6, to argue that "simply riding in the front seat of the engine as OIC is not serving in a higher-level supervisory position").  Defendant also argues that Plaintiff's Affidavit does not create a genuine issue of material fact as to whether he was treated differently, because it is replete with opinions, conclusions, and hearsay and thus constitutes inadmissible material.  Reply 13–15.

---

[6] Defendant also argues that Plaintiff's only submitted request for acting pay is distinguishable from those of Larsen, Whitaker, Fessler, and Mills because (1) it was not for coving a "vacancy," but rather for covering Lt. Clements's sick leave, and (2) it was made retroactively, rather than during or on the front-end of filling the vacancy, as were all the requests for Plaintiff's comparators.  Reply 12.  However, as noted previously, Plaintiff's Title VII claim cannot rest on Defendant's rejection of this request for acting pay made on behalf of Plaintiff, because it pre-dated the June 2021 statute of limitations period.  Thus, these aspects of the rejected request—like the request itself—are immaterial to determining the legality of the challenged actions in 2021.

As such, Defendant argues that the Court should disregard the assertions in the Affidavit for purposes of evaluating Plaintiff's *prima facie* case for discrimination.

As a preliminary matter, the Court notes that Plaintiff cannot rely on the November 2020 email to support his Title VII claim because it relates to Defendant's decision to deny Plaintiff acting pay, and any claim based on that specific decision is time-barred. *See supra* Part IV.A.1. Additionally, the Court cannot accept any statements from Plaintiff's Affidavit that are conclusory or "based upon hearsay." *Simmons v. Whitaker*, 106 F.4th 379, 386 (4th Cir. 2024); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit . . . used to support or oppose a [summary judgment] motion must be made on personal knowledge [and] set out facts that would be admissible in evidence."). The Court will accordingly strike and disregard any inadmissible and improper portions of the affidavit. *Simmons*, 106 F.4th at 386.

These preliminary issues aside, the Court must now consider whether Plaintiff has presented sufficient evidence for a jury to find that Plaintiff and his comparators were engaged in substantially the same conduct when filling in for absent lieutenants and that, despite this similarity, Larsen, Whittaker, Fessler, and Mills were approved for acting pay, whereas Plaintiff was rotated out of the OIC role to prevent his eligibility for the same. The Court finds that Plaintiff has. Specifically, the Court takes into account the following:[7,8]

---

[7] While Defendant is correct that Plaintiff failed to specifically identify much of the supporting evidence that follows in his Response in Opposition to the Motion for Summary Judgment, and further that "[i]t is not the Court's responsibility to undertake the herculean task of reviewing a voluminous record to find evidence to support each party's position," Reply 3 (quoting *U.S. ex rel. Davis v. Prince*, No. 1:08-cv-1244, 2011 WL 2749188, *3 (E.D. Va. July 13, 2011)), the Court nevertheless *may* undertake such review and take un-cited materials into consideration. Fed. R. Civ. P. 56(c)(3) ("The court *need* consider only the cited materials, but it *may* consider other materials in the record. (emphases added)).

[8] Plaintiff's evidence also included other materials, the admissibility of which Defendant has challenged. *See, e.g.*, Reply 18 n.5. Because of that challenge, the Court does not consider those materials in reciting the evidence that ostensibly supports Plaintiff's comparator arguments. *See Whittaker v. Morgan State Univ.*, 524 F. App'x. 58, 60 (4th Cir. 2013) ("While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" (quoting Fed. R. Civ. P. 56(c)(2)).

- Asst. Chief Buchanan testified that, for a firefighter to be eligible for Acting Officer pay, he must have served as the "tactical commander of the day, . . . the supervisor basically, . . . . where [he is] taking ownership . . . of the shift."  Buchanan Dep. 27:2–12, ECF No. 31-5.  Buchanan distinguished "just riding up" [i.e., merely filling the OIC role], where the "job is just to make sure we go to calls and nobody gets killed" and the individual is *not* conducting performance evaluations, completing disciplinary forms, and coaching employees, from "taking ownership," where the individual is "now responsible for [other] employees [and] would contribute to their performance evaluations [and] . . . discipline."  *Id.* at 27:13–28:3;

- Plaintiff affirmed that he was "expected to lead the shift in the absence of a Lieutenant[]," and that, on one particular occasion, he was "asked to return to the station to 'deal with an issue' at a Lieutenants level" on September 27, 2021.  Blagmon Aff. ¶¶ 122, 129–30;

- Plaintiff further testified that when he served as an Acting Officer, he was involved with training new firefighters, Blagmon Dep. 54:18–55:3, ECF No. 35-12, and he "had to assume ownership of the company, make sure training occurred, make sure everybody's time sheets were done," in addition to performing "informal discipline," *id*. at 79:24–80:14;

- Defendant's proffered explanation for why one of Plaintiff's comparators, Whitaker, received acting pay in contrast to Plaintiff was that he (Whitaker) "was the only acting officer permanently assigned to [his Station] and performed the [supervisor-level] duties and responsibilities . . . that qualified him."  EEOC Resp. 7.  Plaintiff has presented evidence suggesting that Plaintiff was likewise the only person at Station 4C

19

qualified to be acting officer, and that he "basically assume[d] the role of a lieutenant
. . . and complete[d] all reports, paperwork, et cetera." Clements Dep. 58:1–16, ECF
No. 35-7;

- Battalion Chief Mooney testified that he recalled that Plaintiff "was asked to be Acting
Officer during" the time Lt. Clements was out due to his shoulder injury, Mooney Dep.
23:4–6, ECF No. 35-10, which was the August-through-December-2021 vacancy
implicated by Plaintiff's Title VII claim, *see* SUF ¶ 30 ("On August 20, 2021, Lt.
Clements injured his shoulder at work, causing him to be out on sick leave and then
restricted duty.");

- Lt. Clements testified that his expectation, during the vacancy caused by his shoulder
injury, was that Plaintiff would be "in charge," Clements Dep. 42:18–43:5, ECF No.
35-7; and

- Lt. Clements further testified that he agreed with the characterization that "when
[Plaintiff] was the acting officer, he was performing lieutenant duties . . . in terms of
administration work and training," and that he "took 'ownership' of his shift in
[Clements's] absence," *id.* at 68:2–10.

Although Defendant certainly challenges Plaintiff's characterization of the work that he engaged
in as OIC during Clements's absence, and although aspects of Defendant's evidence rebut
elements of the above-recited evidence, *e.g.*, Clements Dep. 68:23–69:5, ECF No. 31-3 (conceding
that there were times where Plaintiff was assigned to the OIC role even though Lt. Clements was
also on shift, suggesting that simply sitting as OIC does not inherently impose lieutenant-level
responsibilities), the Court is not permitted to engage in weighing the evidence at this stage. *See*
*Alexander v. Conner*, 105 F.4th 174, 178 (4th Cir. 2024) (at the summary judgment posture, once

the non-moving party who would bear the burden of proof at trial produces "evidence that could—if believed—permit a reasonable factfinder to rule in their favor[,] . . . the court must decide a summary judgment motion on the assumption that the factfinder would believe that evidence and credit it over *any* contrary evidence offered by the moving party." (emphasis added) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))). Rather, the question is whether Plaintiff has established a sufficient basis for comparison to allow the Court to submit to the jury the final question of whether Plaintiff and his comparators are similarly situated. *Tinsley*, 854 F. App'x at 501; *cf. Polak v. Va. Dep't of Env't Quality*, 57 F.4th 426, 429–32 (4th Cir. 2023) (recognizing that whether someone is an adequate comparator is a question of fact for the jury but affirming grant of summary judgment for the defendant because the plaintiff failed to present sufficient evidence to create that question of fact).

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, the Court finds that Plaintiff has established a sufficient basis for comparison to create a jury question as to whether Plaintiff and his comparators were similarly situated when the comparators received acting pay but Plaintiff was rotated out of shifts to prevent his eligibility for the same. Thus, Plaintiff has established his *prima facie* case, for purposes of surviving summary judgment.

### b. *Defendant Articulates Legitimate Nondiscriminatory Reasons for Its Actions*

Finding that Plaintiff has provided sufficient evidence for a jury to find that Plaintiff made a *prima facie* case of race discrimination, the Court now turns to the second step of the *McDonnel Douglas* framework. At step two, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Wannamaker-Amos*, 126 F.4th at 256 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)). A defendant's

burden is "one of production, not persuasion," and cannot involve a credibility assessment. *Id.* at 256–57 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). So long as a defendant's reason is lawful, a court need not consider whether the decision was "wise, fair, or even correct." *Id.* at 257 (quoting *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017)).

Here, Defendant presents two legitimate, nondiscriminatory reasons for why Plaintiff was pulled from the acting officer position (rendering him ineligible for acting pay) during the period in question. These are: (1) that it was the Department's policy to rotate individuals in order to avoid paying acting officer pay, Br. Supp. 19; and (2) Station 4C routinely needed to task overtime employees in order to maintain minimum staffing requirements, and there was a department directive for any volunteer or reassigned superior officers to serve in the OIC position, *id.* at 19–20.[9]

Based on its provision of these facially legitimate, nondiscriminatory justifications, the Court finds that Defendant has met its burden of production at the second step of *McDonnell Douglas*.

   *c. Plaintiff Provides Sufficient Evidence For a Jury to Find That Defendant's Reasons Were Pretext for Discrimination*

The burden thus returns to Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were pretext for discrimination." *Holland*, 487 F.3d at 214 (quoting *Reeves*, 530 U.S. at 143). Pretext can be established by either "offering evidence that the employer's justification is 'unworthy of credence,'" or by presenting "other forms of circumstantial evidence sufficiently probative of

---

[9] Defendant also offers nondiscriminatory justifications for its 2020 denial of acting pay for Plaintiff. Br. Supp. 20. However, as discussed repeatedly, that denial is barred from serving as the predicate for Plaintiff's Title VII claim by the applicable statute of limitations, and so the Court does not engage with those arguments here.

discrimination." *Wanamaker-Amos*, 126 F. 4th at 257 (quoting *Reeves*, 530 U.S. at 143). If a plaintiff establishes that an employer's justification is "unworthy of credence," then "discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* (quoting *Reeves*, 530 U.S. at 134). If a plaintiff demonstrates evidence of pretext by either aforementioned method, then the "case must be decided by a trier of fact and cannot be resolved on summary judgment." *Id.*

Defendant argues that Plaintiff has not provided sufficient evidence that Defendant's reasons were pretextual because Plaintiff does not explicitly address Defendant's legitimate non-discriminatory reasons in his Response in Opposition. Reply 15. Although Plaintiff did not address Defendant's legitimate reasons in a separate subheading within his response, the Court finds that Plaintiff adequately presented evidence and argument to create a jury question on the issue of pretext. Specifically, record evidence suggests that Defendant inconsistently justified its reason(s) for rotating Plaintiff out of the OIC role, and also that Defendant inconsistently applied its "policy" of rotating OIC assignments to avoid paying individuals acting pay.

### i.    *Defendant provided inconsistent justifications for rotating Plaintiff out of the OIC role.*

Plaintiff has presented evidence suggesting that Defendant's reasons for removing Plaintiff from the OIC/acting officer position have changed over time, or at least have been inconsistent. "[W]hen a company changes its story after it cannot support its initial story, there is an obvious issue of pretext." *Holland*, 487 F. 3d at 217; *see also Wannamaker-Amos*, 126 F.4th at 258 (the fact that an employer "has offered different justifications at different times . . . is, in and of itself, probative of pretext").

Specifically, the record evidence shows that Plaintiff has received the following explanations for his removal from the OIC role (organized chronologically):

23

- During the period in which Plaintiff was being regularly rotated out of the OIC role, Plaintiff confronted Battalion Chief Mooney on at least two occasions and asked him why, to which Mooney "basically laughed and blew [Plaintiff's inquiry] off and told [Plaintiff] [he] was tired, they didn't want to overwork [him]."  Blagmon Dep. 52:14–55:3, ECF No. 35-12;

- On March 18, 2022, in a conversation between Plaintiff and Assistant Chief Buchanan, Buchanan informed Plaintiff that it had been the Department's policy to rotate firefighters out of the OIC role specifically to avoid triggering Policy 6.6.  SUF ¶¶ 37–38; Br. Supp. 21; March 18, 2022 Audio Recording at 07:41, ECF No. 31-14 (on file with the Court);

- On an unknown date, Assistant Chief Buchanan spoke to Battalion Chief Mooney and asked him "what had happened" with Plaintiff when Lt. Clements was out, to which Mooney "just very briefly said, . . . we just booted him out as a practice."  Buchanan Dep. 45:2–9, ECF No. 35-6;

- In its November 22, 2022 EEOC Response, Defendant explained that "[p]rior to April 2022, the standard practice of the Department was to rotate as many firefighters as feasible to serve as OIC to provide widespread opportunities for growth and development."  EEOC Resp. 4, ECF No. 35-4;

- In his deposition in connection with this case, Assistant Chief Buchanan testified that Blagman was pulled from the OIC role before he could qualify for acting pay as a result of a "business practice that started back around 2008, . . . when the economy was really really bad, . . .  and the County Administrator . . . would tell us to . . . move [people

24

otherwise serving as acting officers] because we literally didn't have the money. . . . and that became the practice for a while . . . ."  Buchanan Dep. 35:3–25;

- When deposed in connection with this case, Battalion Chief Mooney testified that reasons for transferring Plaintiff out of the OIC role included policy, providing training, ceding the role to an officer, and/or that he didn't recall.  Mooney Dep. 20:5–25, 23:14-24:4, 26:22–27:2, 28:8–17, ECF No. 35-10;

- Chief Piland testified in his deposition that there was a longstanding practice within the Department where they "would rotate [people otherwise serving as acting officers] . . . . letting [them] serve in the Acting Officer role for a little while and then trading them out for other folks."  Piland Dep. 67:5–17, ECF No. 31-6.

Although there is certainly a consistent theme among the explanations, i.e., that Plaintiff was removed from the OIC role due to some longstanding departmental policy of rotating/trading out OICs, Defendant has nevertheless offered various other explanations along the way, e.g., to avoid overworking Plaintiff, or to provide him with training, or because an officer was assigned to the same shift.  Based on the changing explanations encompassed by the record, the Court finds that a reasonable jury could find, by a preponderance of the evidence, that Defendant's stated reasons are pretext.  *Wannamaker-Amos*, 126 F.4th at 258.  Thus, the Court should leave this issue to the jury.

### ii.   *Defendant's policy of rotating firefighters out of the OIC role to prevent triggering acting pay was inconsistently applied.*

A jury could alternatively find that Defendant's purported legitimate, nondiscriminatory reason for rotating Plaintiff out of the OIC role—that it was the Department's policy to rotate firefighters to allow firefighters to gain experience and to avoid incurring additional costs—was pretext because Plaintiff has offered evidence to show that, even if that policy did exist, Defendant

inconsistently applied it to him—a Black man—relative to Caucasian firefighters. Plaintiff has specifically pointed to four other Firefighter/Medic employees—Larsen, Whitaker, Fessler, and Mills—who *did* receive acting pay at various times. This fact, when viewed in the light most favorable to Plaintiff, could support a finding that Defendant was not as constrained by its policy of rotating assignments to avoid paying acting pay as it would have Plaintiff and the Court believe. Resp. Opp'n 4–5, 13; *cf. Gary v. Facebook, Inc.*, 822 F. App'x 175, 181–83 (4th Cir. 2020) (considering the same comparator at both the prima facie stage and the pretext stage of the *McDonnell Douglas* analysis). Thus, based on the evidence presented, a jury could reasonably find that Defendant's policy-based explanation was mere pretext.

### iii.  Department directive regarding superior employees taking OIC role by default does not disprove above-described grounds for finding pretext.

Finally, although Defendant's second nondiscriminatory justification (that it had a directive whereby, if an overtime employee filling in on a shift is of a superior rank, that employee automatically takes the OIC role) is unrebutted by Plaintiff, it does not—in and of itself—disprove pretext. In short, the Court finds that the same evidence presented by Plaintiff to rebut the policy-based explanation (inconsistent stories and inconsistent application) apply with equal force here. Accordingly, the question remains for the jury as to whether it believes Defendant rotated Plaintiff out of the OIC role because of Station 4C's staffing needs coupled with this directive, or if it did so because it was driven by some discriminatory animus.

Based on the foregoing, the Court finds that a jury question remains as to whether Defendant's "proffered explanation is unworthy of credence." *Holland*, 487 F. 3d at 218. As such, the Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim.

3.  Damages Available

Because the Court has determined that Plaintiff's Title VII claim can proceed, it must address one final issue in that regard.  While the predicate facts giving rise to Plaintiff's Title VII claim are limited to those encompassed in Plaintiff's EEOC charge and arising since June 11, 2021, the Lilly Ledbetter Fair Pay Act of 2009 ("FPA") allows

> [a] plaintiff who has filed a timely EEOC charge for at least one instance of pay discrimination [to] . . . recover back pay for pay discrimination that occurred in the two years prior to the filing of the EEOC charge, if the discrimination that occurred outside the charge period is "similar or related to" the unlawful practice in the timely-filed EEOC charge.

*Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 585 (E.D. Va. 2009); *see* 42 U.S.C. § 2000e-5(e); *Kramer v. Bd. of Educ. of Balt. Cnty.*, 788 F. Supp. 2d 421, 427 (D. Md. 2011) ("[A] plaintiff who alleges that []he received a discriminatory paycheck within 300 days prior to the filing of her EEOC charge, has adequately pleaded a Title VII wage discrimination claim."); *Graves v. Indus. Power Generating Corp.*, 2011 WL 63696, at *12 n.24 (E.D. Va. Jan 5, 2011) ("Because the compensation decisions raised by Graves had an effect on subsequent pay rates, the FPA would appear to prevent Graves's claim from being time barred.").  Put differently, a plaintiff who timely brings a pay discrimination claim may recover for other discriminatory pay actions that took place two years prior to filing the EEOC charge and that are "similar or related to" any timely pay discrimination claims.

Here, Plaintiff alleges in his EEOC charge and in his Complaint that Defendant discriminated against Plaintiff based on his race by preventing Plaintiff from earning acting pay by way of rotating Plaintiff out of the OIC/acting officer role.  *See* EEOC Charge; Compl. ¶ 46. Accordingly, based on the FPA, should a jury find that Defendant discriminated against Plaintiff, the jury may also consider any of Defendant's related actions towards Plaintiff as early as April 7,

2020, when determining Plaintiff's recovery.  Based on the circumstances surrounding Plaintiff's

fill-in OIC work, the Court finds that Plaintiff's challenge to Defendant's November 2020 rejection

of Plaintiff's request for acting pay is "'similar or related to' the unlawful practice in the timely-

filed EEOC charge," *Johnson*, 682 F. Supp. 2d at 585, such that a jury may consider this rejection

in calculating appropriate back-pay.

**B.  42 U.S.C. § 1981**

     In Count Two, Plaintiff presents a claim for race-based discrimination in violation of 42

U.S.C. § 1981.  As with his Title VII claim, Plaintiff predicates this Count on the allegation that

Defendant did not provide earned acting pay to Plaintiff and/or prevented Plaintiff from earning

acting pay, because of his race.  Compl. ¶ 54.  Defendant moves for summary judgment on this

Count because (1) Plaintiff "cannot meet the heightened [but-for] causation standard [of] 42 U.S.C.

§ 1981," Br. Supp. 22–23, and (2) Plaintiff "cannot establish a *Monell* claim against [Defendant],"

*id.* at 23–25.  Because the Court agrees that summary judgment is appropriate on the latter ground,

it constrains its analysis to that issue.[10]

     "Section 1981 provides that '[a]ll persons . . . shall have the same right . . . to make and

enforce contracts . . . as is enjoyed by white citizens.'"  *Guerrero v. Ollie's Bargain Outlet, Inc.*,

115 F.4th 349, 354 (4th Cir. 2024) (quoting 42 U.S.C. § 1981(a)).  "The statute defines 'make and

___

[10] The Court will note, however, that—while Defendant failed to raise it as grounds for summary judgment—an additional, critical deficiency exists with respect to Plaintiff's § 1981 claim.  Specifically, Plaintiff endeavored to bring Count II as a standalone § 1981 claim, notwithstanding clear precedent dictating that "§ 1983 is the exclusive remedy for violations of § 1981 by state actors" and that a plaintiff "has no cause of action based on § 1981 independent of § 1983."  *Farmer v. Ramsay*, 43 F. App'x 547, 553 n.8 (4th Cir. 2002) (citing *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701 (1989)); *see also Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *Lewis v. Robeson Cnty.*, 63 F. App'x 134, 138 (4th Cir. 2003) ("In a suit brought against a state actor, [§] 1983 is the exclusive federal remedy for a violation of the rights guaranteed in § 1981."); *Spellman v. Sch. Bd.*, 2018 WL 5799648, at *10 (E.D. Va. Oct. 15, 2018) (finding that plaintiff was required to assert her § 1981 claims against a school board by way of § 1983); *Tucker v. Sch. Bd. of Va. Beach*, 2014 WL 55297323, at *13 (E.D. Va. Oct. 31, 2014) (dismissing § 1981 count because Plaintiff failed to bring her claim under § 1983).  While independent grounds for summary judgment exist, *see Monell* discussion, *infra*, and it would be improper for the Court to grant summary judgment on *this* issue without providing notice and a reasonable opportunity to respond, *see* Fed. R. Civ. P. 56(f), the Court nevertheless finds the issue important to highlight.

enforce contracts' to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* (quoting 42 U.S.C. § 1981(b)). Section 1981 is made actionable against local government bodies by 42 U.S.C. § 1983, which allows lawsuits "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be [unlawful] implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In other words, "a municipality cannot be held liable under a theory of *respondeat superior* for its employees' violations of § 1981." *Crowley v. Prince George's Cnty.*, 890 F.2d 683, 685 (4th Cir. 1989). Thus, "in order to hold liable a municipality for its employees' actions, those actions must represent the official policy of the municipality." *Id.* (citing *Jett*, 491 U.S. at 735–36).

As articulated by the Fourth Circuit,

> [a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Here, only the first and second avenues are in dispute: whether the discrimination alleged by Plaintiff implemented or executed an "express policy" or "the decisions of a person with final policymaking authority" within the County. *Monell*, 436 U.S. at 690; *Lytle*, 326 F.3d at 471; Br. Supp. 24 ("The third and fourth ways in which to hold a municipality liable are not applicable here."); Resp. Opp'n 27–30 (only arguing policy or custom in the form of express policy and final policymaking authority-decision). The Court similarly only considers these two avenues of *Monell* liability.

### 1. Express Policy

Defendant first argues that "[t]here is no evidence that a policy or custom of the County resulted in [Plaintiff's] alleged discrimination." Br. Supp. 24. Plaintiff rebuts by pointing to Policy 6.6 regarding acting pay. Resp. Opp'n 27. This Policy says nothing about paying White Firefighter/Medics acting pay and denying it to Black Firefighter/Medics, however, and so the Court is unpersuaded that Policy 6.6 constitutes an express policy of the County to discriminate in allowing active pay on the basis of race. Accordingly, the Court does not find that any discrimination that occurred in the denial or prevention of acting pay resulted from an express policy of the County.

### 2. Decision of a Final Policymaking Authority

Plaintiff argues that Fire Chief Piland constitutes a final policymaking authority, and his "decision" to deny Plaintiff acting pay constitutes discrimination in the form of municipal policy. Resp. Opp'n 27–30. Defendant counters that "Chief Piland never rendered a decision as to whether Blagmon should or should not receive acting pay under Policy 6.6," Reply 1, and thus there is no actionable decision by a final policymaking authority by which to impose *Monell* liability on the County, *id.* at 20.

The parties do not contest that Chief Piland constitutes a final policymaking authority, so the Court accepts without deciding the same.[11] *See* Resp. Opp'n 29; Reply 20. Even accepting this aspect of Plaintiff's argument, however, Plaintiff has failed to identify evidence that Chief Piland made any decisions regarding Plaintiff's receipt of or eligibility for acting pay. Though

---

[11] The Court notes that County Administrator John Budesky may also be considered a final policymaking authority for the County in this context. *See* Resp. Opp'n 25 (tracing state law to identify the County Administrator as the individual responsible for the administration of County affairs and for the appointment of the Fire Chief). Nevertheless, the parties do not argue that County Administrator Budesky made any decisions with respect to Plaintiff, and deviating from the parties' apparent consensus that Chief Piland had final policymaking authority in the relevant context does not change the Court's ultimate outcome on this issue.

Plaintiff's exhibits in support of his Response in Opposition to Summary Judgment do include one approval of acting pay clearly signed by Chief Piland, *see* Resp. Opp'n Ex. 14 (Mills acting pay authorization from 2014), the remainder of the attached acting pay requests are either signed or submitted by other members of the Fire Department or contain an unidentified signature that may or may not be that of Chief Piland, *see* Resp. Opp'n Exs. 15, 16. And, the only evidence submitted with respect to Plaintiff's denied acting pay request from 2020 does not indicate any decision making involvement by Chief Piland. Br. Supp. Ex. 11. Other evidence likewise supports the conclusion that Chief Piland made no decision specific to Plaintiff's pursuit of acting pay. *See* Br. Supp. Ex. 13 (Buchanan note to file regarding Plaintiff's concerns regarding acting pay; Buchanan notes that "Lt. Clements advised he had requested acting officer pay for Blagmon to his Battalion Chief on November 15, 2020, but it was effectively denied by BC Lee Mooney."); Buchanan Dep. 82:5–14, ECF No. 31-5 (Buchanan's understanding that Lt. Clements' request for acting pay "never made its way to the Office of the Fire Chief"); Piland Dep. 87:5–16, ECF No. 36-3 (Chief Piland commenting that he "can only speak to the decisions [he] made," not those that stopped with Battalion Chief Mooney). Based on this record, it is apparent that Chief Piland made no decision impacting Plaintiff's receipt of, or eligibility for, acting pay. Hence, the Court must conclude that Plaintiff has failed to establish a policy or custom of discriminatory pay practices based on the decision of a final policymaking authority.

In light of the foregoing, Plaintiff cannot maintain a § 1981 claim against Defendant, because Plaintiff has failed to adduce evidence of any custom or policy of the County that caused the alleged pay discrimination he experienced, as required for the County to be held liable pursuant to *Monell*. The Court will therefore grant summary judgment in favor of Defendant on Count II.

## V. CONCLUSION

For the reasons explained above, the Court will deny-in-part and grant-in-part Defendant's Motion for Summary Judgment.  Plaintiff's Title VII claim for race-based pay discrimination occurring on or after June 11, 2021, survives, while Plaintiff's § 1981 claim will be dismissed.  An appropriate Order shall issue.

_____ /s/

Roderick C. Young
United States District Judge

Date: June 13, 2025
Richmond, Virginia